We have Rosa Gossage for the appellant and Barbara Scherer for the appellee. Ms. Gossage, you may proceed. Ms. Gossage, don't mind me, I had back surgery, so I'm standing for a little bit. I've been here with a crutch. And some other... Accessories. Accessories, yes. Your Honor, this case involves a long-term marriage, 21 years at the time of Andrew the judge. I'm going to use the first names of these people. Angela, the wife, got married and had left New Jersey where she lived, left her job to come here to Illinois to be with Monty and his three children at that time. She married him in 1991, it was October, no, April 1991. And the next year she had a child. So she was there with four children she was taking care of. And Monty, taking care of the household. Now, Angela was born on October 21st, 1952. At the time of the divorce judgment she was 60 years old. She will be 62 in this October. Monty is seven years younger than her. She's 53 at the time of the divorce. She had worked minimally outside the home during this marriage. By bringing her apart she worked as a substitute teacher and earned minimal income during the marriage. The most she's ever earned was a little over $18,000 in the last year of this marriage, as indicated by the record. The records would also show a year or two before that she only made $11,000, a little over $11,000. Monty, on the other hand, had been employed at the same job for 32 years. And his earnings in 2011 was $101,830. In 2012, $126,846. Average those two out. His average income, if you want to do average income and to project or impute income, was $114,338 for those two years. He also testified that he gets a 1.6% increase every year. So from 2011 or 12, he's gotten a 3.2% increase of his income and he gets bonuses. However, Angela, if you take a look at the incomes of these two people, Angela makes 18% of his income. Where did the court get that your client could or had the ability to drastically increase her income to $50,000? That was one of my arguments. Give me a moment. The court's imputing $50,000 a year of income. Where did it come from? My guesstimate is from the cloud because there was no testimony, no evidence. She's 60-some years old at the time. I'm not sure where that figure came from. No evidence was introduced? No evidence. I went through the transcript a number of times. There was no evidence indicating she could make $50,000. And then when I tried to compute how he rationalized this, giving her $1,500 a month income, if we take her $18,000 of income and then impute, and not impute, but take the $1,500 a month gross maintenance he gave her for two years, those two things might add up to $50,000. But he only gave it for two years. And the court, I'm sure, is aware of the gun case, which is the Fifth District case, that indicates this is one of those cases, in the long lines of cases, for permanent maintenance. What is this woman going to do at age 60? Where is she going to be hired? How is she going to make $50,000 of income? We're all aware of what's going on now with the school districts. They're tightening, they're contracting, they're hiring cheaper items for people. This woman tried. And if you look at the statute, the maintenance statute all provides that certain items have to be considered. And one of those is current and future earning capacities. In two years from the 60, she's almost 62 now, in two years from then, how is she going to make the $50,000? Who's going to hire a 62-year-old when she's going to be retiring at 65? Ms. Gessage, I saw in the documents that there was an order entered that she would get maintenance, and then the husband filed a motion to reconsider. And the court said that the payment of maintenance and the award and the valuation would be stayed 30 days until after the residence is sold. Has the residence been sold? Yes, but she has not gotten one dime, no maintenance, and no payment of fees. Why? The argument was unclean hands doctrine. We continued the case on the trial level because of the compelled argument. So we didn't actually go there, but the court, I filed a petition for contempt based on disorder. She had not gotten a dime of maintenance, and she had not gotten any of her money. I haven't gotten any of my fees. No payments were made, except he's been making the minimal payments on credit cards. However, my client has sold stuff, has done other things in order to at least comply with the court order. I believe one of the cards, the American Express card, but I'm not sure. She has paid her portion of it just to try to do this. She is now working a second job. She can't find a full-time job. She's still a substitute teacher. And she testified that she makes more money as a substitute teacher than she would at any other full-time job. I'm not sure what the court wants her to do at 62 or at 60, but these are the realities of what life is now. You seem to rely on your brief that the judge was very patient with you and your client in this case. Yes. I'm wondering, I was concerned at least when the judge said it's afternoon and I'm giving you two minutes and then I'm leaving. What kind of history was that? That was the first time. The second time. Well, first answer my question. What was the deal there? Was it only set for a half a day? No, he just indicated there was going to be a half a day and we had another half a day and he had something else happening or there was something. And I don't recall exactly. Well, and then the second time he goes, there's not going to be a third day. If you wish to waste your time, that's your business. The court's not going to waste any further time with additional hearing dates. And then you were cut off in your cross. Yes, Your Honor. What prompted that, how the trial court? I'm not sure, Your Honor. I know that the husband had direct examination by his attorney, close to two hours. And at that point, that statement was made and I had to finish up my cross examination within an hour. I could not go into details. Do you think that your case was compromised by that limitation? Your Honor. I'm just asking why. Because, one, I could not go into the credit card debts. I could not go into the debts indicating how much was marital, how much was not marital, how much he knew about. When you look at the records, five years prior to that, he had been handling the debts. So I had no opportunity after his direct cross-examination. No opportunity to cross-examine on his disposable income, which appeared to be close to $5,000 each month. No opportunity to cross-examine him to say that after 32 years you don't believe your job is secure. The fact that you don't have a degree may not be a substance in this case because after 32 years at the job and you're making $126,000, it appears that you have a fairly secure position. It also compromises my cross-examination of him indicating how much and how often he has provided for the family, their lifestyle, that he's the main provider and what he has provided for the family, the bills he's paid, the fact that he permitted her to go to college and get the master's and he knew about it, because this was within that five-year period. Nor could I testify, nor could I have gotten it from him, the fact that what she did at the household, she stayed home, she cooked, she cleaned, she took care of his three kids, she took care of him and their son, Phillip. Well, the court seemed to have quite a bit of information about the credit cards. I think the credit card debt was $56,829.88, according to the briefs. Okay. What I don't understand is how the judge arrived at Monte paying so much less than Angela. Do you have an explanation of that? Well, I not only went over it, but I had somebody else, another attorney, go over this with me. We're not real sure. There's a $22,000 difference. But in addition to that, the judge also ordered Angela to pay her student loan of another $35,000, which is a marital debt, whether it's individual or it's joint. It doesn't matter as it's a marital debt. And there was no question that the marriage was intact and not undergoing a breakdown? No. Five years ago, six years ago, no. There was no testimony as to that. I'm sorry. You can proceed. I'm not sure. If you can find your spot. I can give you what I thought I figured out, but I'm not really sure about this. Okay? What I gathered was any credit card in joint names, he divided it somehow. Okay, that's the $56,000. Then he just somehow apportioned the credit cards in their individual names, whether they're marital or not, but he apportioned those to the people who incurred those debts. Then he assigned the student loan of $35,000 or $36,000 to my client. So if you look at—and, again, I'm not sure about this because I'm not sure about the math. I had trouble calculating. My client would have had $76,219.14 of debt on an income of $18,000. And $1,500 a month maintenance, if and when she got it. But the maintenance, the court has to understand, is not $1,500 in her pocket. He gets a deduction for it, and my lady has to pay taxes on it. If she would have been in, let's say, the $36,000 income bracket with the maintenance and her income, she'd be paying 18% on those taxes, federal taxes plus state, whatever else is taken. So she doesn't get that amount. And yet the court ordered only $1,500 in assigning her all this debt and the lifestyle he's priced. Yeah, they lived a high lifestyle, but they've gotten rid of the debt. The house is sold. He doesn't have a mortgage. He's not paying anything for the son. He paid no maintenance during the pendency of this divorce case. All he paid was the mortgage and utilities. And she stopped paying a few months before the hearing, final hearing of this. I gathered that the court was of the opinion that the lifestyle was not supported or supportable by their income, and partly that she was responsible for the debt that was rather extravagant debt for the income that these people were earning. Do you feel that there was some type of punishment or something that was involved? Yes, because he also alleges that she opened up numerous lines of credit. But the testimony was what she did is she took credit cards and she changed them to lower interest-bearing credit cards, which a lot of people do and have been doing. So instead of 23% interest, she got a 15% interest, and that's what happened. Until he stopped giving her any money. So then she had to get a credit card for herself to pay for food, for gas, and I believe that's in the transcript, and for other items, living expenses, during the divorce case, pendency of the divorce case. And she also paid for her son. Bill, again. Did he pay any child support? No. But his son turned to be 20. He's in school. How about the educational expenses for the same child? No. So are you telling me that there's still litigation going on in this case? Yes. I have a petition for contempt for his failure to comply with the orders of court. Selling the properties as ordered. Inventorying the storage unit. My understanding is they have to clean that out. Selling the timeshare plan. Paying my attorney's fees. Paying her the $12,000. Paying maintenance. And that's just off the top of my head. I think there's other items, but I'm not prepared to argue anything that happened after the motion to reconsider. Talk to me a little bit, if you would, briefly about your claim of dissipation. This is after the breakdown of the marriage. This is a mural asset. It took $5,000. My client objected to it. And he paid for his daughter's wedding. Not my client's daughter. His daughter from the prior marriage. And the $4,000 that was taken from the joint checking, do you think that was dissipation? I'm sorry. I don't recall that. The briefs indicated there was $4,000 taken out of a joint checking account to open a personal checking account without your client's knowledge. Oh, yes. He did that, too. And he said he paid bills with that. But that's about all we have. And that's in light of the fact he was making $126,000 that year. Okay. Thank you. Thank you. I did not see a points and authorities in your brief. I'm sorry. I don't. I thought I did. I may have missed it. It's very helpful, I might add. If the court wishes, we can submit one. Good idea. We'll do that in the next seven days if that's okay. Yes. Ms. Sharon. Good morning. Good morning. May it please the Court. My name is Barbara Sharon. I am here to do oral argument on behalf of the athlete, Monty Barker, who I will refer to as Monty. Justice Chapman, your initial question that you started out with, requesting the points and authorities, I do want to bring up what I noticed, that this brief was in violation, or I should say not in compliance, with Supreme Court Rule 341. And while I don't necessarily want to make a stink about that, I do also want to point out that nowhere in the brief has a standard of review been enumerated or identified as is usually done in the statement of facts. And what this Court's job is, as far as I understand it, is not necessarily to retry the case and relook at the evidence and to perhaps think, you know what, I did a better job than Judge Byers did. This is the way we would look at it. It's really to look at whether or not he abused his discretion. Is there any way you can look at this evidence and say, meh, there's no way a reasonable person would have come to this decision. And Judge Byers is the one who had the opportunity to look at, to hear the parties speaking, to hear them testify, to observe the demeanor of the parties, to hear what they had to say. And while I will get to, in a moment, addressing some of the questions that Justice Cates asked about how he came up with the $50,000 imputation of income, I figured that that was going to be one of the first questions off the bat. We also have to look at some of the things that were said by, excuse me, Angela Barker. She lied about charging on her credit card after the split. She at first says that it was just for gas and food, but then she kind of backtracks, and it's clear that other expenses were charged on one of the credit cards. When the parties – Like what? Well, let's see. Other than food and the necessities of life, what else did she charge? Lots of charges at a Bass Pro Shop to indulge their son in a hobby while it sounds interesting and might be something that a couple with a higher income could support. These people don't have the money for their son to have a boat, the insurance on the boat, a trailer, a storage locker for the boat, a truck for the boat. And then the mother, Angela, who's in trouble financially, knows that her marriage is falling apart, decides to use $10,000 from arguably her premarital funds to buy their son a Mustang just because he wanted a regular car down at school. Their credit card debt on that one credit card that Angela had control of was $2,000 in September 2011, which is right around the time they separated, and in August of 2012, it had jumped to just under $18,000. That's a huge jump. That's beyond gas and food. Do you attribute all that to the boat, then? No, I definitely do not attribute all that to the boat, though I'm sure it would be a nice boat if it was. They already had a boat. She let her son have unfettered access to this credit card for iTunes charges, and he didn't charge $15,000 in iTunes. But one of the charges that stuck out in my mind was her buying a CD collection of the Trans-Liberian Orchestra. While arguably relaxing and interesting, it's not something that people spend money on while they're going through a divorce and worrying about how they're going to support themselves. And your client did nothing of that sort. Did he? He didn't use his credit cards or his available funds for anything except the necessities of life. Are we talking about his Match.com membership? I'm just—  I'm not saying— You're asking a question. But he was worried about getting the bills paid down. I mean, he was worried about the fact that she transferred some of these credit cards to low-interest credit cards, which were great. They were low-interest for maybe six months to a year, but then they jump up to 21%. She also— Could you get to the $50,000? Because I'm really curious about that. Could I get to the $50,000? Yeah, if you wouldn't mind. I mean, where does a judge find that she can make $50,000? What was the evidence in the record? I couldn't see it. Do you want me to speculate? No, you were there. Well, actually, I was not there. I did not try this case, nor did I write the briefs in this case. I am only doing the oral argument. Let me try and address it the best I can, okay? If I'm not, maybe you can redirect me. I think what the—the way I can explain the $50,000 is this. These people were living at a lifestyle that had run amok. I mean, they were living at a lifestyle that you usually see people who, I would guess, have a combined household income. It's probably upward of $225,000, $250,000. Perhaps what the judge was saying was, you know what? You're working part-time. You're not even working full-time during the year. You're earning just the $20,000. If you were to do this, really endeavor to do this, this is what you could be earning. Perhaps it was based on his belief or some personal knowledge of what a schoolteacher in Illinois could make. Perhaps it was based on what somebody with a master's degree should anticipate. Is that appropriate for him to— I think so. —make those considerations? No. It's not. I mean, we both know that it's not. There were a lot of—I mean, there were things in the brief that are also discussed that are not supported by the record, that are not necessarily appropriate, I think, to bring before this court, such as comments about how my client, Mr. Barker, is not complaining. First of all, it's not necessarily accurate, and you're not getting the full picture. So I think that personal experience and comments and common sense played into this by all of the supposed authorities or people— But we're looking for court error right now. I understand that, Your Honor. And you're right. What you just said, you're right. But we are restricting ourselves to court error, which is why I'm concerned about some of the comments the judge made to the parties who were appearing before him. Yes, Your Honor. I understand that. I mean, when I looked at that $50,000 and I tried to decipher where it came from, I did a little of my own research beyond what was presented to me with the briefs. I know that with the imputation of income, the case law that I found pretty much deals with child support cases. There is a case, I believe it is, in rape remarriage of sit-ins where they talk about if you're qualified for more than one profession, you sort of have an obligation to look there. This is a woman who thought that she could earn enough money, at least more than the $18,000 a year she was earning in 2008, to go to school and get a master's degree. She invested herself in that. It sounds pretty ill-advised from the get-go. Do you think that the judge in some way felt that she should bear the brunt of that ill-advised endeavor? I can't speculate on what was going through Judge Byers' mind, but I would say that if somebody invests themselves in a master's degree and they don't find a job in that particular area, that they're probably going to look beyond that one particular area. And I know from trying another case in front of Judge Byers that I appeared before this court on November 5th, there were some questions about, comments about how a job search in that situation should have been expanded beyond a career directive. And I think in this case, if you get a master's degree in teaching, it does not mean that you are only qualified to be a school teacher. Also, she got her master's degree sometime in 2010. This case was tried in the fall of 2012. So I'm assuming she had it for probably about two years at that time. I'm assuming that her master's degree was awarded sometime in the late summer, spring of 2010. To only send out 40 job applications, which is what she said she did, in a two-year period, after you've gotten a master's degree, while you're going through divorce, your son, who supposedly that's part of the reason you have not worked for the period of the marriage, it's office school, in this case, fishing. To only work for 40 jobs is absurd. Forty jobs is usually your initial job search when you send out resumes. This woman also appeared in court when she was asked about whether or not she had proof of her application with her. She made some comments about, I didn't know I was supposed to bring that with me. I mean, I find that to be lacking in credibility. So I don't know if that was what was going through the judge's mind to punish her. I wouldn't say punish, but to sort of say, you know what, you went and did this, now you can earn this income. I really don't know. I know that there are cases that talk about not only being able to, looking for a job in another area, and I had started with In Re Marriage of Citizens. This is a woman who prior to moving out to, I'll refer to it as this area, the Midwest, had worked as an accounting clerk. She clearly had other talents and abilities. I would also not discount the abilities and the skills she developed being a stay-at-home parent for, I guess it was 17 years at that point in time. But there was a gap of any real employment for 20 years? There was a gap. Well, she, for a period of years. She was a substitute teacher, which doesn't take a whole, I don't even think you have to have a college degree to be a substitute teacher. Which is kind of frightening, but it's true. I would agree with you that that's accurate. She also had endeavored to have a second job. She had purchased, during the time that the marriage was breaking down, $3,000 worth of Mary Kay, let's call it inventory. And she sold, I think, $200 or $300 worth, had it sitting in her basement. She's complaining about money. She has nothing to do all day, and she doesn't even try to sell it, say, to other reps in the area or schedule parties. I mean, I don't know if the judge's imputation of income was, for lack of a better term, I'm gesturing with my hands with sort of a, get up, get moving, come on, do something. I really don't know. I can't, I don't know. I know that with the imputation of income, they talk about, in the case of in remarriage of Smith, where her husband resigned as corporate president. And again, this is not a maintenance case. It's a child support case out of the Fourth District. And he starts his own business. They talk about his ability. So perhaps this was a comment on what the judge thought her ability to be. I mean, there were no clearly set out standards, at least in the state of Illinois, that I found that talk about what are the factors for imputation of income, and definitely not on maintenance cases. And there is no case that either, that you cited, that imputes income for maintenance, in lieu of maintenance. In remarriage of Mitra, it talks about looking at the income from all sources. And I cannot, I believe that that is also a child support case. I know that in remarriage of McGrew, which I believe may have been a maintenance case. That was a Fifth District case. They talk, it's again a case about wasting the assets that you have available to you. It's a case where there was farm income that came in, and she was renting it out at a lower rate. I mean, perhaps the judge was viewing her master's degree as an asset, as it should be, and that she was just letting it sit there and not doing anything. Forty job applications in two years is nothing. And I know that I have not totally answered your question, and I just don't have an answer for you beyond my own speculation and common sense, and what I would piece together as the case law giving us some direction. What about the fact that the maintenance was not permanent? In the Fifth District case of in right of marriage of Kipe, K-E-I-P. Yes. Seems very similar to this case. How would you distinguish it? In Kipe, was there somebody who had the ability to have a master's degree? No. I didn't think so. I was the author of that case. Right. Thank you. So I just didn't know. Right. There wasn't. I mean, that's how I would distinguish it. This woman has ability. I mean, there was some sweeping generalizations about the job market's bad for teachers, and everybody knows it's a woman. But she'd never been a teacher. That's why when I talk about the ill-advised degree, she got a master's degree in teaching, essentially, and never had taught in her life. So it seems pretty unrealistic that she would get hired over somebody that's 25 and newly minted at a much reduced rate. I mean, while that would seem to be reasonable, I mean, that would probably be something I would say if I was just having a discussion with a friend of mine about doing it. I mean, obviously, about doing it. I don't know. She had worked as a teacher's aide. She had been a substitute teacher, which you and I just decided really don't need much of a qualification beyond, I guess, a bachelor's degree, hopefully a bachelor's degree, to be able to do that in the state of Illinois. But it probably was ill-advised. But the sweeping generalizations are both on all sides that, oh, it's hard for a woman at this age to get a job, and she's got this degree, and everybody knows they hire the young kids fresh out of college to do it. I really don't know what to say to that, except that just because you have a master's degree in a certain area doesn't mean you look at your job search down one particular avenue. I mean, our own profession being the best example, I mean, I know by this point in my life, I have colleagues who I went to law school with who don't practice law. They do other things. There are other things that you can do with a master's degree. And this woman is limiting her job search to that area, that one particular focus, which really doesn't make any sense. But when a judge uses that as a basis for determining other matters without any proof or any substance, it causes concern. Because he just – I mean, where did the figure come from? Your guess is as good as mine. I don't – unfortunately, I know I shouldn't have an answer for you, and I knew that you were going to be asking – You wish you did. I know that there were instances throughout the case where it was clear that Ms. Barker was lacking in credibility. I mean, just the – she sold stuff during the trial, like she sold an entertainment center and then went and used her credit card and bought something new. She was requesting money for college tuition, indicating my client hadn't contributed at all, but then sort of backtracks when it's brought out to her that during the entire time their son went to SWCC, he was living at home and my client was paying all the bills. She was requesting money for his bachelor's degree where he's now at SIU Carbondale, indicating, well, one, that my client wasn't contributing anything, which in reality is not accurate even when he went to Carbondale because he co-signed on the lease and paid the first month's rent and deposit. She was asking for money for room and board, and at one point testified that in addition to the fact that his son was obviously living in off-campus housing in an apartment, that there was also going to be a room and board charge. I mean, things that just do not make any sense. Any comments? Ms. Scherer, thank you for your briefing. Ms. Garza, do you have any rebuttals? I'm sorry? Rebuttal? Yes, ma'am. It appears that some of the briefs did not have the points and authorities in them as some of them did when I had it filed. So I can present that to the court today. That would be helpful. Is that one you have that's happened? That's fine with the court. Okay. Actually, we'll give it to the clerk. Actually, you probably ought to file it in substitution in compliance with the court. Of course, Ms. Scherer, I'm sure, would like a copy of it. Your Honor, the abuse of discretion standard is correct in a lot of the matters. However, this is an abuse of discretion. Where that $50,000 came from is the abuse of discretion. No reasonable person, in light of this woman, in light of what's going on, could somehow pull off a sum of $50,000. And from that $50,000, the rest of the orders to enter flow from that, and the rest of the orders are abuse of discretion because he uses that as the standard. She could be making $50,000. So that's what I'm determining, her income, her standard, everything else. What the judge has done is placed this woman in an impoverished status. The manor, all his orders, impoverished. 30-day delay after the house is sold to give her maintenance, to give her her $12,000. And in 30 days, she's supposed to figure out how to get a new place to live, electrical bills, etc., etc., without any other funds. With respect to the expenses, what I've heard is she spent money on her son. This is what they've lived, they have one son between them, and this is the way they've lived, that one son. She spent $10,000 of her premarital funds for her son, for a car that he was promised a long time ago to go to school. I see nothing wrong with that. Was that part of the personal injury case that was referenced or something else? No, no. In effect, she has permanent injuries. She has a droopy eye and some other problems. But the court decided to split that 50-50, and she only got $10,000 from that. So the court gave the husband half of the settlement. Yes. Was he listed in that personal injury lawsuit? I don't think so. The CD collection that was referred, that's maybe $35 we're talking about that she charged. With respect to the employment and pliability, I think even by arguing law students now can't even find jobs, it's a good indication of what the market is. But the statute provides that the son, and for purposes of maintenance, future and present earning capacity, well, 60-year-old, 62-year-old, she has difficult. In the jobs, she had 40 jobs looking for teaching jobs. She's indicated there were other jobs she did, but none of the jobs that she qualified for paid as much or more than she got paid as a substitute teacher. Why take a full-time job that you're going to make less money at than being a substitute teacher? Are you saying that she was offered some jobs, but they weren't? Less income. Less income. She made less. Okay. The applications, everything now is online. You don't get any, she could, you know, print out applications, maybe, maybe not. They're up through computers now. Everything's done online. The applications, the 40 were for teaching jobs. She got no responses or she got negative responses there. With respect, trying to make an income. Well, if you're a desperate person and Mary Kay is maybe a method of making more money, that's what she tried to do. What I'm asking the court to do is to remand us with directions to pay maintenance in the sum of $3,000 a month as permanent maintenance, to divide the property equitably in this case. To order that the maintenance is retroactive, at least to the date of the sale of house, and that he should pay same. That the credit card bills, they should be adjusted. And if the court, if the trial court wanted 40%, then he should have included that $35,000 debt as part of the debt load when he divided. And not give her more than 60% or 70% of the debt. When he included the student loan. Excuse me. Thank you. Thank you, Ms. Passage. Thank you, Ms. Scherer, for your briefs and arguments. And we'll take them at our own advisement. We're going to take a brief recess.